No. 23-1592 (L)
(consolidated with No. 23-1594)

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

THE WILDERNESS SOCIETY
*Petitioner*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Respondents*,

&

MOUNTAIN VALLEY PIPELINE, LLC,
*Intervenor*

**PETITIONER'S MOTION FOR STAY PENDING REVIEW**

Petitioner The Wilderness Society ("Petitioner") seeks a stay under Federal Rule of Appellate Procedure 18(a) pending review of the approvals for the Mountain Valley Pipeline challenged in these consolidated petitions. The pipeline company is poised to begin construction on the Jefferson National Forest—clearing trees, grading, and trenching through steep mountains and sensitive watersheds—inflicting irreparable harm on Petitioner, its members, and the environment absent a stay.

1

## **BACKGROUND**

The Mountain Valley Pipeline ("MVP") is a proposed 303-mile natural gas pipeline that would carve through the Jefferson National Forest (the "Forest") in West Virginia and Virginia. Ex. A, Final Suppl. Envtl. Impact Statement ("FSEIS") at 1. To construct its pipeline on this public land, Intervenor Mountain Valley Pipeline, LLC ("Mountain Valley") was required to obtain approval from the U.S. Forest Service ("Forest Service") and the Bureau of Land Management ("BLM"). *Id*. at 5. The Forest Service and BLM (collectively the "Agencies") have tried twice before to authorize MVP, but their prior efforts were vacated in *Sierra Club v. U.S. Forest Service*, 897 F.3d 582 (4th Cir. 2018), and again in *Wild Virginia v. U.S. Forest Service*, 24 F.4th 915 (4th Cir. 2022).

This motion is focused on the Forest Service's role in approving MVP.[1] Under the National Forest Management Act, the Forest Service administers each national forest according to a land and resource management plan, known commonly as a forest plan. *Wild Virginia*, 24 F.4th at 921. All activities on a national forest must be consistent with the applicable forest plan. *Id.*

---

[1] BLM does not administer any land along the pipeline route, but it is responsible under the Mineral Leasing Act for deciding, in consultation with the Forest Service, whether to grant Mountain Valley a right-of-way across the Forest and issue a temporary-use permit for construction. *See* FSEIS at 1.

The forest plan governing the Forest is commonly called the Jefferson Forest Plan (the "Plan"). *Id.* at 923. The crux of this case is that MVP cannot be built across the Forest without violating at least eleven standards in the Plan "that are intended to protect soil, water, riparian, visual, old growth, and recreational resources." FSEIS at 136. One problem is that the construction techniques Mountain Valley plans to use are fundamentally incompatible with protecting those resources as the Plan standards require. *Id.* at 66. The other problem is that Mountain Valley has been dogged by an inability to effectively control erosion and sedimentation and protect water quality during construction. *See Sierra Club v. FERC*, 68 F.4th 630, 650–51 (D.C. Cir. 2023) (describing violation history); *Sierra Club v. W. Va. Dep't of Envtl. Protection*, 64 F.4th 487, 502 (4th Cir. 2023) (same).

Instead of rejecting the project due to these issues, the Forest Service decided to change the Plan to accommodate the pipeline. According to the agency, it is "not practical to modify the MVP construction methods" in a manner that would allow the pipeline to achieve compliance with the Plan, so the Forest Service proposed to amend the Plan to exempt MVP from those eleven standards. FSEIS at 64–66. This is the agency's third try after this Court vacated its first two amendment decisions in *Sierra Club* and *Wild Virginia*.

After *Wild Virginia*, the Agencies prepared a new supplemental environmental impact statement under the National Environmental Policy Act, and

3

the Forest Service again proposed to amend the Plan to "exempt" Mountain Valley from the same eleven Plan standards, which would "allow [MVP] to be consistent with the Forest Plan." FSEIS at 6, 18. The Forest Service also proposed adding a new "MVP-specific" Plan standard to incorporate portions of Mountain Valley's Plan of Development (the "POD") into the Plan. *Id.* at iii.

On May 15, 2023, the Forest Service issued a record of decision, choosing to amend the Plan, waive the standards Mountain Valley cannot satisfy, add the MVP-specific standard, and provide concurrence to BLM that a right-of-way grant and temporary-use permit should issue. Ex. C.[2] Two days later, BLM released its own record of decision, granting Mountain Valley a right-of-way and a permit. Ex. E.

Petitioner filed these consolidated petitions for review two weeks later. ECF No. 2 (No. 23-1592); ECF No. 2 (No. 23-1594). No stay was necessary at that time because construction on the Forest could not commence without approval from the Federal Energy Regulatory Commission ("FERC") and a notice to proceed from BLM. *See* Ex. H at ¶ 3 & n.15 (describing restrictions on construction).

Shortly after these petitions were filed, the Fiscal Responsibility Act of 2023 was signed into law. Section 324 of that statute attempts to expedite completion of MVP and purports to decide this case in favor of the government and Mountain Valley. Pub. L. No. 115-8, § 324 (2023). However, as Petitioner has explained,

---

[2] A list of exhibits is attached to this motion.

Section 324 has no effect in this pending case because it is unconstitutional. *See* ECF No. 22 (No. 23-1592).

Last week, FERC granted Mountain Valley approval to restart construction, including on the Forest. Ex. H at ¶ 10. Absent a stay, the only remaining impediment to construction on the Forest is that Mountain Valley must receive a notice to proceed from BLM. *Id.* at n.15. As of last Friday evening, Petitioner was informed by the Special Projects Coordinator for the Forest that BLM had not yet issued the notice to proceed. But it is only a matter of time. Mountain Valley states that it "is in the process of mobilizing resources to resume construction in early July"—well before this case could be heard in the ordinary course.[3] Ex. I.

Petitioner did not seek a stay from the Agencies prior to this motion because such a request would have been futile. *See* Fed. R. App. P. 18(a)(2)(A)(i). Under Section 324(c)(2) of the Fiscal Responsibility Act, the Agencies must "continue to maintain" all authorizations for MVP. As required by Local Rule 27(a), counsel for Petitioner informed the other parties of Petitioner's intent to file this motion. They oppose.

---

[3] The parties could not agree on a briefing schedule that would include a respite from construction on the Forest during the pendency of this motion. Petitioner is not currently requesting a temporary administrative stay, but such a request may become necessary when the notice to proceed issues. However, the Court need not wait for the notice to proceed before entering a stay pending review. *Cf. Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 217 (4th Cir. 2019) (rejecting argument that preliminary relief "should issue only at the last minute").

## STANDARDS OF REVIEW

1.   The Court determines whether to grant a stay pending review by evaluating four factors: (1) whether Petitioner "has made a strong showing" that Petitioner is "likely to succeed on the merits," (2) whether Petitioner "will be irreparably injured absent a stay," (3) "whether issuance of the stay will substantially injure the other parties," and (4) whether a stay would be in the public interest. *Nken v. Holder*, 556 U.S. 418, 425–26 (2009).

2.   The Court reviews the Agencies' challenged actions under the Administrative Procedure Act. *Wild Virginia*, 24 F.4th at 926. The Court will hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## ARGUMENT

Petitioner is likely to succeed on the merits and faces irreparable injury absent a stay. The other two factors also weigh heavily in favor of a stay.

## I.   Petitioner is Likely to Succeed on the Merits.

As an initial matter, Section 324 of the Fiscal Responsibility Act does not preclude the Court from reaching the merits. Section 324 unconstitutionally attempts to dictate a result in this pending litigation and can be given no effect in this case, as Petitioner has explained elsewhere. *See* ECF No. 22 (No. 23-1592).

Petitioner is likely to succeed on the merits because the Forest Service violated the National Forest Management Act ("NFMA"), National Environmental Policy Act ("NEPA"), and Administrative Procedure Act in its latest effort to accommodate MVP—at times directly flouting this Court's decisions in *Sierra Club* and *Wild Virginia*. This motion focuses on two overarching NFMA violations that fatally infected the Forest Service's decision.

### a. Legal Background: Forest Service regulations implementing NFMA prescribe a clear and mandatory process governing forest plan amendments.

Whenever the Forest Service wishes to develop, revise, or amend a forest plan, it must comply with a set of regulations called a "planning rule." *Wild Virginia*, 24 F.4th at 921. The Jefferson Forest Plan was last revised according to the requirements of the now-outdated 1982 Planning Rule. *See* FSEIS at 255. In 2012, the Forest Service replaced the 1982 Planning Rule—which had largely focused on "mitigat[ing] harm"—with a new rule that requires forest plans to provide "a proactive approach for maintaining or restoring" ecological resources. 77 Fed. Reg. 21,162, 21,163–74 (2012). To that end, "[t]he 2012 Planning Rule imposes 'substantive requirements' for sustainability, diversity of plant and animal communities, multiple land uses, and timbering that are intended to 'maintain or restore' ecological integrity and ecosystem diversity in national forests while

preserving those forests for multiple uses." *Wild Virginia*, 24 F.4th at 921 (quoting

77 Fed. Reg. at 21,162).

When the Forest Service is faced with a project like MVP that would violate

forest plan standards, the agency has a choice to make. It must decide "whether to

modify the project to ensure consistency with the forest plan, reject the proposal or

terminate the project, or amend the forest plan to accommodate the project." *Id.*

(citing 36 C.F.R. § 219.15(c)). The 2012 Planning Rule allows the Forest Service

to amend a forest plan at any time, but it does not give the agency free reign to do

as it pleases. *Id.* If the Forest Service wants to amend an older plan developed

under the 1982 Planning Rule, it must apply certain substantive requirements of the

2012 Planning Rule by following a three-step process:

- **Step One:** determine which existing forest plan standards would
  preclude the project and would need to be amended;

- **Step Two:** determine which of the 2012 Planning Rule's substantive
  requirements are "directly related" to the proposed amendment; and

- **Step Three:** apply the directly related substantive requirements "within
  the scope and scale" of the amendment.

FSEIS at 137 (citing 36 C.F.R. § 219.13(a) and (b)(5)). This process allows the

Forest Service to amend old forest plans without redoing them entirely (called plan

revisions), while at the same time ensuring the agency does not "use the

amendment process to avoid both 1982 and 2012 rule requirements." 81 Fed. Reg. 90,723, 90,726 (2016).

In this case, the Forest Service amended the Plan to exempt MVP from eleven Plan standards and add an MVP-specific standard incorporating portions of the POD. FSEIS at 6. Once again, the Forest Service made multiple errors at each step of the process. This motion is focused on some of the agency's most significant errors at steps two and three.

**b. Step Two: The Forest Service arbitrarily disregarded several directly related substantive requirements.**

The Forest Service's decision to amend the Plan was doomed from the start because the agency disregarded several substantive requirements at step two that it arbitrarily decided were not directly related. The 2012 Planning Rule instructs that a substantive requirement may be "directly related" to a proposed amendment based on the amendment's "purpose" *or* its "effects." 36 C.F.R. § 219.13(b)(5); *see also Sierra Club*, 897 F.3d at 602 ("[I]f the substantive requirement at issue (i.e., soil, water) is based upon or associated with either one, it is *directly related*.").

In this case, the Forest Service refused to acknowledge three directly related substantive requirements that apply to timber-harvest activities like clearcutting a pipeline right-of-way. Specifically, the substantive requirements codified at 36 C.F.R. § 219.11(d) mandate that forest plans must ensure "timber harvest" for "timber production or other purposes" will:

9

1. "[O]ccur only where soil, slope, or other watershed conditions would not be irreversibly damaged," *id.* § 219.11(d)(2);

2. "[B]e carried out" in a way that protects soil, wildlife, and water resources, among others, *id.* § 219.11(d)(3); and

3. Provide protection for waterbodies from temperature changes, blockages, and "deposits of sediment" if the harvest is "likely to seriously and adversely affect water conditions," *id.* § 219.11(d)(5) (incorporating 16 U.S.C. § 1604(g)(3)(E)).

These substantive requirements are necessarily site-specific. For example, § 219.11(d)(2) forbids timber harvest anywhere that soil would be "irreversibly damaged," which is a restriction that cannot be circumvented by pointing to undamaged soil elsewhere on the national forest. *See* Ex. J at § 64.12 (Forest Service Handbook stating this provision "require[s] a site-specific finding").

These three substantive requirements are directly related to the purpose of the Plan amendment for MVP. The Forest Service amended the Plan to exempt the pipeline from six standards that directly protect soil and watershed conditions (FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003) and one standard that directly protects old-growth forest from timber harvest (6C-007). Ex. C at 4–5. "[T]he clear purpose of the amendment is to lessen requirements protecting soil and riparian resources so [MVP] could meet those requirements" while clearcutting and grading

the right-of-way. *Sierra Club*, 897 F.3d at 603. All three of the substantive requirements at issue here—§ 219.11(d)(2), (3), and (5)—protect soil, water, and other resources during timber harvest for any purpose, including during pipeline construction. Unavoidably they are directly related to the purpose of the amendment. *See Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 163–64 (4th Cir. 2018) ("To say that a 2012 Planning Rule requirement protecting water resources (as one example) is not 'directly related' to a Forest Plan amendment specifically relaxing protection for water resources is nonsense."), *rev'd and remanded on other grounds*, 140 S. Ct. 1837 (2020).

Rather than follow its own rules, the Forest Service insisted that the substantive requirements at § 219.11(d)(2), (3), and (5) are not directly related to the amendment because "none of the standards proposed for modification are not [*sic*] timber standards." FSEIS at 237. This is not true. All the forest plan standards listed above—FW-5, FW-8, FW-9, FW-13, FW-14, 11-003, and 6C-007—apply to "management activities" including "timber harvest." Ex. K at 2-7, 3-82, 3-181. Simply put, they are timber standards.

In addition to being wrong, the Forest Service is also inconsistent. The Forest Service recognized that two of the standards listed above—FW-14 and 6C-007—are directly related to the substantive requirement at § 219.11(c) concerning timber harvest for purposes other than timber production. Ex. B at 2–3. In other

11

words, even under the Forest Service's cramped approach, the agency itself agrees that FW-14 and 6C-007 *are* timber standards. *See, e.g.*, FSEIS at 147 (recognizing that "Standard 6C-007 restricts timber harvesting"). The Forest Service's differential treatment of these standards in the context of § 219.11(d)(2), (3), and (5) is baffling. Because the agency's rationale "is internally inconsistent, it is arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

The Forest Service's failure to identify and apply these directly related substantive requirements means it "entirely failed to consider an important aspect of the problem." *Cowpasture*, 911 F.3d at 163 (quoting *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014)). "This failure is significant" because application of § 219.11(d)(2), (3), and (5)'s site-specific requirements to MVP would require the agency to ensure tree clearing during construction is carried out in a way that protects soil, water, and riparian resources at the project scale—not by reference to other parts of the Forest. *Id.* Against the backdrop of Mountain Valley's persistent failure to protect soil, water, and riparian resources during pipeline construction, the Forest Service's refusal to apply these substantive requirements will produce real harm to the very resources that the Forest Service is supposed to steward.

### c. Step Three: The Forest Service did not apply the directly related substantive requirements within the scope and scale of the amendment.

The Forest Service also went wrong at step three because it did not apply its (incomplete) list of directly related substantive requirements "within the scope and scale" of the amendment as the 2012 Planning Rule requires. 36 C.F.R. § 219.13(b)(5).

The 2012 Planning Rule generally gives the Forest Service "the discretion to determine … the scope and scale of any [forest plan] amendment." *Id.* § 219.13(a). However, once the agency defines a scope and scale, it must apply the directly related substantive requirements within that definition. If the agency defines the scope and scale narrowly, it must apply the directly related substantive requirements narrowly; if it sets a broad scope and scale, its application must be commensurately broad. There is no lawful end-around. *See Wild Virginia*, 24 F.4th at 931 (agency cannot manipulate scope and scale to evade the 2012 Planning Rule).

In this case, the Forest Service tried to have it both ways. The agency defined the "scope" of the amendment as "the 11 plan standards that could not be met if the MVP project were implemented and the modification of those 11 plan standards." FSEIS at 142. And the agency defined the "scale" of the amendment as the 54-acre MVP project area for most of the standards it waived for the pipeline.

13

*E.g.*, *id.* at 153. As a result, the agency was required—under its own regulation—to apply the 2012 Planning Rule's substantive requirements "within the scope and scale of the amendment" that the Forest Service identified. 36 C.F.R. § 219.13(b)(5).

But the Forest Service refused. According to the agency, complying with its own regulation is "not practical" at the scope and scale the agency selected for MVP. FSEIS at 250. So the Forest Service split the baby. At times, the agency zoomed out to evaluate whether the 2012 Planning Rule's requirements will be met at the *Forest*-level by "continued application of [*all*] *the unmodified standards* across the plan area, including the MVP [right-of-way]." *Id.* at 155. At other times, the agency zoomed in to emphasize the "limited footprint" of MVP in comparison to the whole Forest. *Id.* at 99. By seesawing between scopes and scales like this, the Forest Service avoided applying the substantive requirements of the 2012 Planning Rule at any of the scopes and scales it mentioned.

This is exactly what the 2012 Planning Rule forbids. *See* 81 Fed. Reg. at 90,726 (Forest Service has "discretion to tailor the scope and scale of an amendment" but cannot "use the amendment process to avoid … [the] 2012 rule requirements"). This Court recognized as much in *Wild Virginia*. There, the Court held that the Forest Service "cannot rely on the notion that because [MVP] will affect only a minimal fraction of the entire Jefferson National Forest," the rest of

14

the Plan will be sufficient to satisfy the substantive requirements. *Wild Virginia*, 24 F.4th at 931. If the Forest Service wants to zoom out to the level of the entire Forest, it must provide "an analysis of whether application of the existing … Plan is adequately protecting [the affected] resources elsewhere in the … Forest." *Id.* at 932.

Rather than do the work that was required by *Wild Virginia*—and by its own choice to look outside the scope and scale of the MVP amendment—the Forest Service tried a shortcut. According to the agency, the directly related substantive requirements of the 2012 Planning Rule are *already* being met across the Forest by the standards that the agency did not waive for MVP, so it can waive standards freely. The Forest Service constructed two pillars to support this assertion, but neither is up to the task.

First, the Forest Service insisted that the Plan's current standards developed under the 1982 Planning Rule are "[f]unctionally" equivalent to standards developed under the 2012 Planning Rule. FSEIS at 255. According to the Forest Service, the Plan and the 2012 Planning Rule "define[]" the term "standard" in a very similar way, so the "content differences" between the two "are not substantial." *Id.* And so, the argument goes, the Plan's standards—developed under the 1982 Planning Rule—must be "sufficient" to meet the new requirements of the 2012 Planning Rule across the Forest. *Id.*

The Forest Service knows better. Just because the Plan and the 2012 Planning Rule share a similar definition of the *structure* of a "standard" does not mean that standards developed under different planning rules will share the same *content*. The Forest Service has said so itself, explaining that there are "fundamental structural *and* content differences between the [1982 and 2012] rules," and that "[b]ecause of the underlying differences, 1982 [plan standards] likely will not meet all of the substantive requirements of the 2012 rule." 81 Fed. Reg. at 90,724 (emphasis added). In other words, the agency's official position is that the Plan's existing standards *cannot* be treated as the functional equivalent of standards developed under the 2012 Planning Rule. The Forest Service offered no justification for its sudden about-face. This was arbitrary and capricious. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

Second, the Forest Service misread the Draft FY 2015-2019 Monitoring and Evaluation Report for the George Washington and Jefferson National Forests, which the agency said "was conducted consistent with the 2012 Planning Rule." FSEIS at 258. According to the agency, the existing Plan must be satisfying the 2012 Planning Rule's substantive requirements across the Forest because the report did not recommend any changes to the Plan. *Id.*

The report does not support that leap in logic. The report—which remains an unsigned draft to this day—includes updated monitoring questions created after a

16

2016 administrative change brought the Plan in line with the 2012 Planning Rule's *monitoring* requirements. Ex. L at 1–2; *see also* Ex. M at 1–3 (describing administrative change to Plan monitoring program). But the report did not analyze the 2012 Planning Rule's *substantive* requirements because it was not designed to. Instead, it evaluated the Forest Service's "progress towards achieving the selected desired conditions, objectives, and goals described in the [*current*] Forest Plan." Ex. L at 3. In other words, the report was designed to assess progress toward meeting the goals and objectives for the Plan developed under the *1982* Planning Rule—not the *2012* Planning Rule's substantive requirements. Because the report was "irrelevant" to the Forest Service's inquiry, it was "entirely arbitrary" for the agency to rely on it. *North Carolina v. EPA*, 531 F.3d 896, 930 (D.C. Cir. 2008).

The Forest Service also tried to bolster its shaky application of the 2012 Planning Rule by relying on the MVP-specific standard it added to mitigate impacts. According to the agency, adding the MVP-specific standard incorporating certain requirements of the POD will help "ensure" the proposed amendment waiving eleven standards for MVP is "consistent with the directly related substantive requirements of the 2012 Planning Rule." FSEIS at 72; *see also id.* at 155, 159, 163–65, 167, 170 (relying on the MVP-specific standard for nearly all the substantive requirements).

But the Forest Service conceded that the MVP-specific amendment does not actually do anything. The FSEIS disclosed that the "POD is considered *part of the proposed action* and thus the effects of implementing the POD are addressed with or without the MVP-specific standard." *Id.* at 172 (emphasis added). Because the POD is part of the proposed action, it necessarily follows that the Forest Service has already determined MVP could not meet any of the Plan standards at issue *with* the mitigation measures described in the POD. The Forest Service cannot now turn around and say those very same mitigation measures—the ones that did nothing to prevent Mountain Valley from needing a total exemption from numerous plan standards—somehow further mitigate the effects of the project. The POD is baked *into* the project. Relying on the empty standard codifying the POD is therefore arbitrary and capricious. *North Carolina*, 531 F.3d at 930.

In sum, the Forest Service's application of the 2012 Planning Rule is arbitrary and capricious in multiple ways. Because the Forest Service made each of these flawed justifications central to its decision, each of these errors alone would independently require vacatur. *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006).

## II.  Petitioner Will Suffer Irreparable Injury Absent a Stay.

Petitioner and its members—and the Forest itself—will be irreparably injured by pipeline construction on the Forest absent a stay. Mountain Valley plans

to "resume construction in early July." Ex. I. By the time this case is heard in the

ordinary course, the damage will be done. And once that happens, "there can be no

do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769

F.3d 224, 247 (4th Cir. 2014).

Environmental harm "by its nature … is often permanent or at least of long

duration, *i.e.*, irreparable." *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251,

264 (4th Cir. 2020) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531,

545 (1987)). The Forest has been spared some of the worst construction impacts to

date because construction stopped in 2018 after *Sierra Club* and never resumed.

*See* Ex. H at ¶¶ 3–4. But the work ahead entails clearing, grading, and trenching

the right-of-way on the Forest. Ex. N at ¶ 4. The harm from these activities will be

irreparable. *See, e.g.*, *Palmetto Conservation Found. v. Smith*, 642 F. Supp. 2d 518,

531–32 (D.S.C. 2009) (harm from "cutting, clearing, and grading" was

irreparable); *see also Sierra Club*, 981 F.3d at 264 (dredging streams to construct

MVP would be irreparable harm). Compounding the problem, construction on the

Forest is likely to produce irreparable harm to soil and water resources—the same

resources the Forest Service failed to protect as the 2012 Planning Rule requires—

because of the erosion and sedimentation that Mountain Valley has struggled to

control throughout the project. *See, e.g.*, *Sierra Club v. Clinton*, 689 F. Supp. 2d

1123, 1145 (D. Minn. 2010) (finding irreparable harm based in part on "increased

sedimentation, degradation and alteration of aquatic habitat, [and] increased runoff and erosion").

These irreparable harms will not only befall places on the Forest like Peters Mountain and Brush Mountain. They will befall Petitioner's members too. Clearing, grading, and trenching on Peters Mountain would require significant earth and soil disturbances, permanently altering the viewsheds, water resources, and forest ecosystems that Dana Olson values and enjoys. Ex. O at ¶¶ 12, 17–18, 23–24. Excavating ten-foot trenches into the steep slopes of Brush Mountain would likely cause irreversible damage to the local water supply that Lynda Majors relies upon, and would forever "scar the viewsheds" she cherishes. Ex. P at ¶¶ 7–8, 16. Construction activities would also "tear a hole through" uncleared portions of the Forest and increase sedimentation in nearby streams, threatening a loss of habitat for vulnerable species Jill Gottesman values, such as the endangered candy darter. Ex. Q at ¶ 11. The harms that can and will occur "while the Court decides the case cannot be undone." *Sierra Club*, 981 F.3d at 264 (citation omitted).

## III.   A Stay Would Not Substantially Injure the Agencies or Mountain Valley and Would Be in the Public Interest.

In the face of the looming irreparable injuries to Petitioner, its members, and the Forest, the balance of hardships tilts in favor of a stay. *See S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) ("If [environmental] injury is sufficiently likely, … the balance of harms will usually

20

favor the issuance of an injunction to protect the environment." (quoting *Amoco*,

480 U.S. at 545)).

Nothing on the other side of the ledger outweighs these harms. The Agencies

will not be injured—much less substantially injured—by a stay. BLM does not

administer the Forest and a stay will not impact its operations beyond MVP. Ex. E

at 7. The Forest Service can continue to manage ordinary activities on the Forest

besides MVP even under a stay. Meanwhile, any harm to Mountain Valley from a

narrow stay of construction on the Forest would not trump the environmental harm

from pipeline construction on this protected public land. *See Sierra Club*, 981 F.3d

at 264 (hardship of irreparable environmental harm from MVP construction

outweighed over $140 million in claimed unrecoverable costs from stay pending

review).

The public interest also favors a stay because there is a manifest public

interest in protecting natural resources from unlawful environmental injury. *See id.*;

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The

preservation of our environment, as required by NEPA and the NFMA, is clearly in

the public interest."), *abrogated on other grounds by Winter v. Nat. Res. Def.*

*Council*, 555 U.S. 7 (2008); *see also League of Women Voters of U.S. v. Newby*,

838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the

perpetuation of unlawful agency action.").

Section 324(b) of the Fiscal Responsibility Act does not alter this conclusion. That provision declares timely completion of MVP is in the national interest because the pipeline will "serve … natural gas demand in the Northeast, Mid-Atlantic, and Southeast regions" and "increase the reliability of natural gas supplies." Pub. L. 118-5, § 324(b). This Court must consider the views of Congress when determining whether to grant equitable relief, but Section 324(b) does not deprive the Court of its discretion to determine how a stay would affect the public interest. *See United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496–497 (2001). At most, Section 324(b) declares that timely completion of MVP "is *a* public interest"—not the only one. *Amoco*, 480 U.S. at 545–46.

In any event, nothing about the narrow stay Petitioner requests would impair the interests expressed in Section 324(b) for two practical reasons. First, natural gas demand in the Northeast, Mid-Atlantic, and Southeast regions is already amply supplied by existing pipeline infrastructure including the Transcontinental Gas Pipe Line ("Transco") system. Ex. R at ¶ 11.

Second, even if demand in those markets were currently unmet, MVP is not capable of increasing the supply for at least several years. MVP is designed to deliver gas to the Transco system. *Id.* at ¶ 6. But Transco is "fully subscribed," which means its entire capacity is already under contract and being used to move gas to end users along the system, including in the Northeast, Mid-Atlantic, and

22

Southeast markets. *Id.* at ¶ 8. Without a significant capacity expansion, Transco "cannot accommodate additional gas deliveries from the MVP without replacing and, therefore, displacing gas already flowing on the pipeline." *Id.* at ¶ 9. This sort of capacity expansion would take years—far longer than the duration of a stay pending review. *Id.* at ¶ 13. In sum, a stay would protect the public interest in forestalling unlawful environmental harm and would not impair any other public interests.

## **CONCLUSION**

For the foregoing reasons, Petitioner requests that the Court issue a stay pending review.

DATED: July 3, 2023

<div style="margin-left:40%">

Respectfully submitted,

/s/ Spencer Gall
Spencer Gall
Gregory Buppert
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
Telephone: (434) 977-4090
Email: sgall@selcva.org

*Counsel for The Wilderness Society*

</div>

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A). This motion contains 5,178 words, excluding the parts of the motion excluded by Fed. R. App. P. 27(d)(2) and 32(f).

I further certify that this response complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word.

/s/ Spencer Gall
Spencer Gall
Southern Environmental Law Center

## CERTIFICATE OF SERVICE

I certify that on July 3, 2023, I electronically filed the foregoing with the

Clerk of Court for the United States Court of Appeals for the Fourth Circuit by

using the appellate CM/ECF system. The participants in this case are registered

CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*See* Fed. R. App. P. Local Rule 25(a)(4).


/s/ Spencer Gall
Spencer Gall
Southern Environmental Law Center